CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

NOV 0 8 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| JO'NATHAN TALBERT, #346496, | ) | |
| Plaintiff, | ) | Civil Action No. 7:07-cv-00450 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JOHN JABE, <u>et al.</u>, | ) | By: Hon. Glen E. Conrad |
| Defendants. | ) | United States District Judge |

Proceeding <u>pro se</u>, plaintiff Jo'Nathan Talbert brings this civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. Plaintiff, an inmate in the segregated housing unit ("SHU") at Red Onion State Prison ("ROSP") in Pound, Virginia, sets forth five groups of claims alleging that defendants employed at ROSP and with the Virginia Department of Corrections ("VDOC") violated his constitutional rights. Plaintiff seeks monetary damages and injunctive relief. For the reasons that follow, the court will dismiss the complaint, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief may be granted.[1, 2]

## I. Factual Background

Plaintiff raises five separate groups of claims, consisting of the following: he should not be housed in the SHU; he has been denied the right to practice his religion as a member of the "Five Percenters" because the Five Percenters have been improperly classified as a Security Threat Group

---

[1] Section 1915A(b)(1) provides that the court shall dismiss a complaint as soon as practicable if the court determines that it is frivolous, malicious, or fails to state a claim upon which relief may be granted.

[2] Plaintiff names a second plaintiff, Thomas Lee Grate, III, in the style of his complaint. Mr. Grate has not signed any of the pleadings plaintiff has submitted in this case. Accordingly, the court will not join Mr. Grate as a plaintiff in this case. And, assuming <u>arguendo</u> that Mr. Grate had signed the complaint, and that plaintiff's naming of Mr. Grate as a co-plaintiff is an attempt to bring a class action, class certification is not proper under Fed. R. Civ. P. 23 because plaintiff has identified no determinative critical issue common to the plaintiffs. <u>Stott v. Haworth</u>, 916 F.2d 134, 145 (4th Cir. 1990). Additionally, a class should not be certified when a <u>pro se</u> litigant seeks to represent a class unless he can "fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4); <u>Oxendine v. Williams</u>, 509 F.2d 1405, 1407 (4th Cir. 1975).

("STG"),[3] and plaintiff has had mail improperly confiscated as a result of its containing references to the Five Percenters; he is being charged for postage for legal mail; he has been denied dental care in violation of the Eighth Amendment; and he has been served food that does not accord with the dictates of his religious diet. Because plaintiff sets forth five distinct groups of claims, and several of the claims have their own history of plaintiff's resort to the prison administrative remedy system,[4] and because of the temporal and factual distinctions between the claims, the court will discuss separately the facts and the attendant legal analysis of each claim.

## II. Standard of Review

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). A complaint fails to state a claim upon which relief can be granted when no relief is available under any set of facts that could be proved consistent with the allegations of the complaint. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002); see also Bell Atlantic Corp. v. Twombly, 550 U.S. ___, slip op. at 8 (2007) (while the complaint need not provide detailed factual allegations, the basis for relief in the complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"; the Court specifically explained, id., slip op. at 18-24, that the Twombly analysis does not run counter to Swierkiewicz or impose a heightened pleading standard);

---

[3] Courts have held that members of the Five Percent Nation of Islam, known as "Five Percenters," have been linked to violence in prisons around the country. See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 466-67 (4th Cir. 1999), cert. denied, 528 U.S. 874 ("In re Five Percenters"). Reportedly, Five Percenters espouse radically racist views and support acts of violence as a means to an end. See id.

[4] Plaintiff's complaint and attachments thereto total 143 pages.

2

Teachers' Retirement System of La. v. Hunter, 477 F.3d 162, 170 (4th Cir. 2007) (citing Swierkiewicz, 534 U.S. at 514, and stating that "a court may dismiss a complaint [for failure to state a claim upon which relief may be granted] only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").

### III. Segregated Housing Unit Status

Plaintiff claims that his requests to transition out of the SHU and into progressive housing have been denied improperly. Plaintiff presents evidence of his exhaustion of administrative remedies regarding the determinations at his ICA hearings. Regarding the ICA hearing on October 5, 2006, Assistant Warden Armentrout issued a Level I response to plaintiff's grievance on November 8, 2006, stating, in pertinent part:

> **Grievance Summary:** You are grieving your ICA Hearing of October 5, 2006, stating you want to go to Progressive Housing.
>
> **Informal Summary:** Your informal attachment is the ICA Hearing Form dated October 5, 2006.
>
> Counselor Hill met with you to discuss this issue on October 26, 2006.
>
> **Investigation:** You informed Ms. Hill that Lieutenant Mullins will never give you a fair hearing because he is a racist. You report you do not want him to do your hearing. You state you have maintained stable adjustment as the DOP [Division Operation Procedure] states. You report you think you should go to Progressive Housing.
>
> Upon review of your record, you were transferred to Red Onion State Prison on September 19, 2005, from Wallens Ridge State Prison. You were assigned to a Security Level 6 with 56 points. You were last assigned to segregation on September 18, 2005, due to an incident, which occurred while you were housed at Wallens Ridge State Prison. This incident resulted in your being charged with the following infractions: Possession of a Weapon; Possession of a Security Threat Group Materials; Simple Assault on a Non-inmate; Threatening Bodily Harm; Disobeying Direct Order. You have also been found guilty of Disobeying Direct Order on November 8, 2005, and on April 27, 2006, you received an unauthorized use and abuse of telephone or mail infraction.

3

DOP 822-7.4 states, "Segregation is not a disciplinary measure but a means of custodial or protective control. Segregation consists of proactive custody and custodial management measures exercised by the facility for the welfare of the inmate or the facility, or both."

\* \* \*

In accordance with the above information, this grievance is considered to be **UNFOUNDED**, as procedures have been correctly applied. No further action appears to be necessary at this time.

Plaintiff timely lodged an appeal and, on November 19, 2006, the Regional Director issued his Level II response, which stated, in relevant part:

Your grievance appeal has been reviewed along with the Level I response and your original complaint. Your grievance regarding the recommendation of the ICA at your Formal ICA Hearing held 10/5/06 has been investigated. Investigation revealed the hearing was held in accordance with policy. The recommendation of the ICA that you should remain assigned to Segregation for a longer period of stable adjustment based on the seriousness and history of institutional charges you have received is deemed appropriate. It should be noted that Warden Ray reviewed and upheld the ICA recommendation. I encourage you to maintain a positive institutional adjustment and remain charge free in an effort to be released from Segregation at a future ICA hearing. . . .

Plaintiff was informed that the "decision of the Level I Respondent is Upheld" and that "Level II is the last level of appeal for this grievance."

On December 21, 2006, plaintiff was given another ICA hearing. Dissatisfied with the outcome, he filed a grievance. On January 30, 2001, the Warden issued a Level I response to plaintiff's grievance, stating, in pertinent part:

**Grievance Summary:** You are grieving your ICA Hearing held on December 21, 2006, remaining [sic] you in segregation. You state you want to go to Progressive Housing and do not want Lt. Mullins to participate in your hearings in the future.

**Informal Summary:** Your informal attachment is the ICA Hearing Form dated December 21, 2006.

4

Counselor Tiller met with you to discuss this issue on January 10, 2007.

**Investigation:** You informed Mr. Tiller you hope there is room for your comments at the time of the interview. You stated you want to be judged according to policy. You stated the Investigator was present at your hearing and verified you did not do what they said. You stated Mr. Mullins is racial [sic] and unprofessional and has something against you. You stated there are religious reasons also because Red Onion does not release Muslims. You said you are seeking litigation on your First Amendment rights. You also said you have maintained a stable adjustment.

Upon review of your record, you were transferred to ROSP-Segregation on September 19, 2005. You were placed in Segregation at WRSP and received the following infractions on September 18, 2005:

| | |
|---|---|
| 102 | possession of a weapon |
| 212 | threatening bodily harm |
| 247 | possession of STG related materials |
| 239A | simple assault on non-inmate (Your record states you kicked an Officer in the chest when he was removing your leg irons.) |
| 201 | disobeying a direct order |

Since your assignment to ROSP you have the following infractions:

| | | |
|---|---|---|
| 11-8-05 | 201 | disobeying a direct order (refused to remove hands from tray slot) |
| 4-27-06 | 228 | sent out mail in another inmate's name[5] |

Your record also notes you held your tray on November 11, 2006.

Investigator Adams reports that he reviewed the video from WRSP and informed you that he could not determine what occurred due to the camera angle and the assault being committed in the cell.

Operating Procedure 861.3-IX (1) states, "Segregation is not a disciplinary measure but a means of custodial or protective control. Segregation consists of personal protection and custodial management measures exercised by the facility for the welfare of the offender or the facility, or both."

Based on the behavior at WRSP and continued behavior problems at Red Onion,

---

[5] The court notes that the instant complaint was received in an envelope bearing the name and return address of another inmate, Daniel Maddox, inmate number 291314.

5

your assignment to segregation status is appropriate. The recommendation by Lt. Mullins is based on your behavior and there is no evidence of discrimination in the decision.

* * *

In accordance with the above information, this grievance is considered to be **UNFOUNDED**, as procedures have been correctly applied. No further action appears to be necessary at this time.

Plaintiff timely lodged an appeal and, on February 7, 2007, the Regional Director issued his

Level II response, which stated, in relevant part:

Your grievance appeal has been reviewed along with the Level I response and your original complaint. Your grievance regarding the recommendation of the ICA at your Formal ICA Hearing held 12/21/06 has been investigated. Investigation revealed the hearing was held in accordance with policy. The recommendation of the ICA that you should remain assigned to Segregation for a longer period of stable adjustment due to your disruptive behavior is deemed appropriate. It should be noted that Warden Ray reviewed and upheld the ICA recommendation. I encourage you to maintain a positive institutional adjustment and remain charge free in an effort to be released from Segregation at a future ICA hearing. . . .

Plaintiff was informed that the "decision of the Level I Respondent is Upheld" and that "Level II is

the last level of appeal for this grievance."

In the instant complaint, plaintiff contends that the denials were "based solely on past

offenses," prior to which he was "infraction free." Alleging that he is not guilty of the conduct at

Wallens Ridge State Prison ("WRSP") on September 18, 2005, which led to the disciplinary charge,

he maintains that his rights were violated because he "proved that it could not be done and was still

denied for progressive population."[6] Plaintiff adds that defendants further violated his rights by not

---

[6] Plaintiff asserts that the charge for that infraction, assaulting an officer, was baseless. A jury trial was held regarding, inter alia, plaintiff's claim that, in fact, he was subjected to excessive force and was assaulted by officers at WRSP on September 18, 2005. The jury returned a verdict in favor of the defendants. See Civil Action No. 7:05-cv-00736 (September 28, 2007).

6

considering his mental health at his ICA hearings.[7]

To the extent plaintiff alleges that his placement in segregation violates his federal due process rights, his allegations are without merit. A prison disciplinary action implicates a liberty interest requiring federal due process safeguards when the punishment imposed inflicts an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 414 U.S. 472, 484 (1995). The determination of whether such an atypical and significant hardship exists is a question of law. Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997). Having reviewed plaintiff's complaint, the court concludes that plaintiff has failed to allege facts sufficient to establish that the length of his confinement in the SHU, or the conditions of his confinement in the SHU, pose an atypical and significant hardship. See Beverati, 120 F.3d at 504 (holding that a six-month term in segregation did not impose an atypical hardship where the inmates alleged that their cells were infested with vermin and smeared with urine; that no outside recreation was permitted; that there were no religious services available; and that food was served in considerably smaller portions). Therefore, because plaintiff does not possess a liberty interest in avoiding

_____

[7] The court quotes verbatim the following passage from plaintiff's complaint:

> I am a disabled prisoner. I am diagnosed with schizoaffective disorder, paranoid schizophrenia, intermittent explosive disorder, anti social personality, personality disorder, anxiety and bi-polar. He has showed his paper work and is still denied to go to progressive population. They are holding a mentally ill prisoner in seg with out justification without taking his mental health into consideration before making a decision.

The court notes that, at the civil trial held in Civil Action No. 7:05-cv-00736 on September 27 and 28, 2007, plaintiff maintained that he has never been diagnosed with any mental illness. In the instant case, however, plaintiff presents a three-page excerpt from an unidentified transcript, wherein an unidentified witness, testifying regarding his "forensic evaluation of Mr. Talbert," states that he "felt that [plaintiff] had schizoaffective disorder. . . . In lay terms, . . . possibly the most serious of the psychotic conditions." The witness further stated that plaintiff's symptoms were "consistent both with schizophrenia of the paranoid-type and bipolar disorder of the manic-depressive type."

confinement in segregation, he is not entitled to due process protections.[8]

To the extent plaintiff's allegations can be construed to assert a living conditions claim under the Eighth Amendment, such a claim is also without merit. The Eighth Amendment protects inmates from cruel and unusual living conditions. Rhodes v. Chapman, 452 U.S. 337 (1981). However, an inmate is not entitled to relief simply because of exposure to uncomfortable, restrictive, or inconvenient conditions of confinement. Id. at 347. In order to state a claim of constitutional significance, an inmate must allege facts which show that he has either sustained a serious or significant physical or emotional injury resulting from the challenged conditions of confinement, or that the conditions have created an unreasonable risk of serious injury. Strickler v. Waters, 989 F.2d 1375, 1380-1381 (4th Cir. 1993). An inmate must also allege facts which show that prison officials acted with deliberate indifference. Id. at 1379. Applying these principles to plaintiff's allegations, the court concludes that plaintiff has failed to state a claim under the Eighth Amendment. While being confined in segregation may be restrictive and inconvenient, plaintiff does not allege that he has suffered a serious mental or physical injury as a result of his conditions of confinement in segregation, and there is no indication that the conditions pose an unreasonable risk of serious harm.[9]

---

[8] Assuming, arguendo, that plaintiff were entitled to due process before being confined to the SHU, the preceding factual summary indicates that plaintiff has, in fact, received the benefit of due process.

[9] Plaintiff's assertion that the ICA failed to consider his mental health condition fails to state a claim of constitutional magnitude. Plaintiff does not allege that he has sought and been denied access to mental health treatment in violation of the Eighth Amendment. In order to state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege acts sufficient to evince a deliberate indifference to a serious medical condition. Estelle v. Gamble, 429 U.S. 97 (1976). To establish deliberate indifference, a plaintiff must present facts tending to demonstrate actual knowledge or awareness of the serious medical need on the part of the named defendants. Farmer v. Brennan, 511 U.S. 825 (1994). And, to the extent plaintiff alleges that his mental health is degraded due to his confinement in the SHU, the United States Court of Appeals for the Fourth Circuit observed in In re Five Percenters, 174 F.3d at 472, that "[d]epression and anxiety are unfortunate concomitants of incarceration; they do not however, typically constitute the 'extreme deprivations . . . required to make out a conditions-of-confinement claim.'" (quoting Hudson v. McMillian, 503 U.S. 1, 8-9 (1992)).

8

See In re Five Percenters, 174 F.3d at 471-72 (long-term placement in segregation or maximum custody is not cruel and unusual punishment; indefinite duration of the segregation does not render it unconstitutional).

For the reasons stated, the court concludes that plaintiff has failed to state a claim upon which relief may be granted regarding his placement in the SHU. Accordingly, the court will dismiss the claim pursuant to 28 U.S.C. § 1915A(b)(1).

## IV. Five Percenter Claims

Plaintiff raises two claims regarding his classification as a member of the Five Percenter STG. Plaintiff presents no evidence of having resorted to the administrative remedies system regarding these claims, as required under 42 U.S.C. § 1997e(a). Nonetheless, inasmuch as plaintiff fails to state a claim upon which relief can be granted, the court will address this claim on its merits.

### A. Security Threat Group Classification

Plaintiff contends that the VDOC "labels the 5% Islamic Nation of Gods and Earths (Nation of Islam 5%) as [an STG]," but that "[t]he Nation of Gods and Earths (5% Nation of Islam) are [sic] misunderstood and mistaken for the group called the 5%ers Suprem [sic] Team and the Islamic Revolutionary 5%ers."[10] In plaintiff's view, "[t]he Islamic Nation of Gods and Earths are [sic] a religious group, not a gang or STG." He maintains that the classification of the Five Percenters as

---

[10] Plaintiff does not dispute his participation or membership in the Five Percenters. However, he goes on at some length, purporting to explain defendants' misunderstanding of the Five Percenters, providing a rather lengthy explanation and defense of the group. He states that the Five Percenters are "not a religion" (although he insists that defining the Five Percenters as an STG violates his Free Exercise rights under the First Amendment and his rights under RLUIPA), that religion is a "political" construction, and that the Nation of Gods and Earths are not "Five Percenters" at all, but have been confused with another Muslim group. In response to the latter assertion, the court notes that "[t]he Nation of Gods and Earths, commonly known as the Five Percent Nation, the Five-Percent Nation of Islam, or the Five Percenters. . . . teach that Black people specifically, and the entire world population more generally, can be divided into three groups" and that "[t]he 5% . . . are the enlightened divine beings. . . ." See http://en.wikipedia.org/wiki/The_Nation_of_Gods_and_Earths.

9

an STG denies him "the right to practice [his] religion."

The merits of this claim under the Free Exercise Clause of the First Amendment have been thoroughly addressed by the United States Court of Appeals for the Fourth Circuit. In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 466-67 (4th Cir. 1999), cert. denied, 528 U.S. 874 ("In re Five Percenters"). In that case, the Court assumed "that the Five Percenters are a religious group entitled to First Amendment protection," id. at 468, but held nonetheless that, because the classification of "Five Percenters as an STG is rationally related to the legitimate end of prison safety and security, it does not offend the Free Exercise Clause," id. at 471. Plaintiff has suggested no factual or legal basis demonstrating that this controlling precedent does not apply to his First Amendment claim.

Plaintiff's allegation that the classification of the Five Percenters as an STG violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., likewise fails, as plaintiff has not shown that the governmental action of classifying Five Percenters as an STG substantially burdens his exercise of religion. Lovelace v. Lee, 472 F.3d 174, 187 (2006). The Supreme Court has defined "substantial burden" as one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981); Lovelace, 472 F.3d at 187. Only when such a showing is made does the government bear the burden of persuasion that its practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. Lovelace, 472 F.3d at 187; Adkins v. Kaspar, 393 F.3d 559, 567 n. 32 (5th Cir. 2004), cert. denied, 545 U.S. 1104 (2005); Civil Liberties for Urban Believers v. Chicago, 342 F.3d 752, 760 (7th Cir. 2003), cert. denied, 541 U.S. 1096 (2004). Although "the inquiry under RLUIPA is more rigorous

than under the First Amendment," <u>Lovelace</u>, 472 F.3d at 188 n. 3, plaintiff does not raise any allegations whatsoever in the instant complaint that the STG classification has prevented him from exercising his religious practices, such as praying, studying religious materials, fasting, or partaking of a diet in conformity with the dictates of his religion. In sum, he has not alleged that the STG classification places a substantial burden on his exercise of religion.

For the reasons stated, the court concludes that plaintiff fails to state a claim upon which relief may be granted regarding the classification of the Five Percenters as an STG. Accordingly, the court will dismiss the claim pursuant to 28 U.S.C. § 1915A(b)(1).

### B. Mail "Confiscated" Because of References to the Five Percenters

Plaintiff alleges that several pieces of mail for him were "confiscated" on July 16, 2007. He states that the mail consisted of "5 envelopes," containing "2 letters and two case laws [sic]." According to plaintiff, the mail was taken because it was "said to be a threat to security because it talked about the Nation of Gods and Earths Nation of Islam (this was only the 2 civil case laws [sic])," and that ROSP officials held the mail for 3 weeks before delivering it to him. In plaintiff's view, "it could not possibly take 3 weeks to realize that it was a civil laws [sic] when the case name is cited on every page. . . ." Construing the complaint liberally, plaintiff alleges that defendants' delay in delivering the mail to him violated his Sixth Amendment right to counsel and his First Amendment right to access the courts and communicate with the courts.

Inmates are guaranteed reasonable access to state and federal courts and to communicate with attorneys. <u>See</u> <u>In re Hull</u>, 312 U.S. 546 (1941). A state prisoner has a constitutional right to meaningful access to the courts, and the state may not abridge, impair, or impermissibly burden the inmate's ability to exercise this right to access. <u>Hudspeth v. Figgins</u>, 584 F.2d 1345, 1347 (4th Cir.

11

1978). However, a prison policy that impinges on an inmate's constitutional right is valid "if it is reasonably related to legitimate penological interests." Altizer v. Deeds, 191 F.3d 540, 547 (1999), citing Turner v. Safley, 482 U.S. 78, 89 (1987).

In Altizer, the Fourth Circuit held that a prison policy of routinely inspecting an inmate's outgoing mail met the Turner standard and thus was constitutional; applying Turner, the Court expressly found that prisons have a legitimate security interest in opening and examining outgoing mail. Altizer, 191 F.3d at 549. Limitations on or interference with an inmate's receipt of incoming mail must also be measured under the reasonableness standard of Turner. See Thornburgh v. Abbott, 490 U.S. 401, 414-15 (1989). Furthermore, this court can easily conceive of legitimate penological interests in ensuring that no contraband or harmful substance comes into the prison through the mail; accordingly, the mere opening and delay of incoming legal mail does not raise a claim of constitutional magnitude. See Griffin v. Virginia, 2002 WL 32591574 *3 (W.D. Va. December 17, 2002), aff'd, 67 Fed. Appx. 837 (4th Cir. 2003).

Accordingly, to establish that his First Amendment or Sixth Amendment rights have been violated by opening incoming legal mail, an inmate must demonstrate that there was some actual harm or prejudice to his ability to communicate with the court or counsel. See Lewis v. Casey, 518 U.S. 343 (1996) (finding that when an inmate has had access to court, but alleges that officials deprived him of some item necessary for meaningful pursuit of his litigation [such as copies of case law from an unidentified source], the inmate must allege facts showing actual injury or specific harm to his litigation efforts resulting from denial of the item); see also White v. White, 886 F.2d 721, 724 (4th Cir. 1989) (finding that, to state a claim based on delay or non-delivery of legal mail, an inmate must allege that he suffered actual adverse consequences as a result of the delay or that the non-

12

delivery deprived him of meaningful access to the courts). Finally, because of the availability of

effective state remedies, allegations that a state actor has negligently or intentionally destroyed, lost,

or interfered with legal mail or other personal property does not state a procedural due process claim

for which state officials can be held liable under § 1983. Pink v. Lester, 52 F.3d 73 (4th Cir.1995)

(citing Daniels v. Williams, 474 U.S. 327 (1986)), Bowler v. Young, 2003 WL 24253707 *1 (W.D.

Va June 25, 2003), aff'd, 78 Fed. Appx. 281 (4th Cir. 2003).

Plaintiff has failed to allege any facts which reasonably suggest that defendants' alleged

actions caused him any actual injury. In the first instance, plaintiff admits that any mail that was

opened and inspected by defendants was delivered to plaintiff in less than a month. He does not

allege that there were documents missing from the opened envelopes, nor that he is aware of any

other instances in which defendants have misplaced, intentionally destroyed, or delayed processing

his mail, legal or otherwise. And, significantly, he does not allege that the mail at issue here was

marked as legal mail. Nor does plaintiff demonstrate that the mail at issue here was, in fact, legal

mail. Assuming arguendo that the mail at issue here, i.e., copies of case law mailed to plaintiff from

an unidentified source, qualify as "legal mail," plaintiff does not allege that any pending litigation

or criminal appeal was hampered by the delay, and he does not allege that his ability to correspond

with counsel or the courts has been hindered by defendants' actions. Moreover, the filing of the

instant suit and plaintiff's extensive filings in another civil matter, which was recently tried before

a jury, strongly suggest that his ability to correspond with the courts has not been hindered.[11] Finally,

the reason given by defendants for the delay in delivering plaintiff's mail (that it related to plaintiff's

involvement in an STG) states a legitimate security interest. In response to this legitimate security

---

[11]See Civil Action No. 7:05-cv-00736 (September 28, 2007).

interest, ROSP has a policy of opening, examining, and evaluating an STG inmate's incoming mail. This policy holds up to the applicable standard of reasonableness.

For these reasons, plaintiff has failed to demonstrate any actual injury or specific harm and, therefore, fails to state a claim of constitutional magnitude regarding the opening and delay in delivery of his mail. Accordingly, this claim will be dismissed, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief can be granted.

## V. Charges for Stamps

Plaintiff claims that he formerly received "10 free legal stamps a week," but that this allotment of free postage for legal mail has been discontinued. Plaintiff contends that this denies prisoners' "freedom of access to the courts because this stops alot [sic] of prisoners from sending legal mail to the courts because they are almost indigent and it costs $s [sic] to send big packages[] to the courts." He adds that "this has placed a [sic] me in a bad situation and has slowed my legal mail down and charged me unnecessary money which im [sic] not supposed to be paying because federal law states prisoners are supposed to get free legal stamps a week [sic]."[12]

---

[12] Plaintiff adds that the Warden at ROSP

sent out a memo saying . . . that if we wanted to send legal mail out the prisoners would have to use our own stamps, take money out of our own accounts and the indigent prisoners will fill out a postage money withdrawal form to send legal mail out but he will be charged to his account as receiving a loan.

Plaintiff argues that "no other facilities in VA DOC are charged for all legal mail" and that "[b]y law we are supposed to get 10 free legal stamps a week."

Plaintiff submits a copy of an informal complaint form that he submitted on August 6, 2007, stating that he had been charged for legal mail, that inmates "are supposed to get $3.90 [in] free stamps a week for legal mail but we have actually been charged," and that "this violates our first amendment rights." On August 13, 2007, plaintiff received a staff response that stated, "Inmates are alotted [sic] $4.10 in legal [illegible] week.." The staff response cited a DOP, but the copy submitted to the court is partly illegible, and the court is unable to determine which DOP was cited.

On August 14, 2007, plaintiff submitted a regular grievance form, stating that he had read that states are
(continued...)

14

The court has already discussed, in section IV.B., above, the critical issue here, i.e., whether the plaintiff has been denied meaningful access to courts and is able to show actual injury as a result of the denial alleged, and it is clear that plaintiff has not been denied meaningful access. Plaintiff is unable to allege adverse consequences or any "actual injury," i.e., more than theoretical deficiencies in his access to the courts, showing that the alleged deficiencies have hindered or are hindering his efforts to pursue a legal claim. See Lewis, 518 U.S. at 351. As for the particulars of plaintiff's claim regarding postage for legal mail, indigent inmates may not be denied a reasonable amount of postage to send legal mail, but they do not have unlimited right to free postage in connection with right of access to court. See White, 886 F.2d at 723.

To state a claim based on the non-delivery of legal mail, a prisoner must allege facts indicating that the non-delivery deprived him of meaningful access to courts by causing adverse consequences to his litigation efforts. Id. In this case, plaintiff has failed to submit any objective evidence showing any actual injury arising from the alleged postage policy. At most, plaintiff alleges that his having to pay a share of his postage expenses has "slowed [his] legal mail down."[13]

_____

[12](...continued)
required by law to

> provide free legal allotment for all prisoners and that facilities can only limit how much free legal stamps that prisoners have a week (such as from 10 legal stamps to 5 legal stamps a week) but not completely take the legal stamps or charge for legal mail to be transported.

Plaintiff further stated that "we are entitled to legal allotment but we have to pay for every piece of legal mail thats [sic] sent out **or use our stamps**." (Emphasis added.) On August 15, 2007, the grievance was denied as untimely. On August 20, 2007, this intake decision was upheld by the Regional Ombudsman.
   It is possible that plaintiff may not have exhausted all available administrative remedies regarding this claim as required by 42 U.S.C. § 1997e(a). Nonetheless, inasmuch as it is clear from plaintiff's submissions that he fails to state a claim upon which relief can be granted, the court will address this claim on its merits.

[13] Assuming the truth of plaintiff's allegations, his inability to obtain free postage for legal mail may indicate that he is not indigent, i.e., that he has funds in his inmate account sufficient to disqualify him for free
(continued...)

15

Plaintiff's submissions in this case and another case indicate that plaintiff has been able to correspond with the court,[14] and there is no indication that plaintiff has missed any filing deadlines in these cases or in any other action.

Thus, plaintiff has failed to show any actual injury and, therefore, fails to state a claim of constitutional magnitude. Accordingly, this claim will be dismissed, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief can be granted.

## VI. Dental Treatment

Plaintiff claims that he has been provided inadequate dental treatment. He states: "Since I have arrived at ROSP on September 19, 2005, I have been complaining about my tooth." He complains that he has "a hole in the back" of one of his front teeth, placed there in the course of a root canal that was performed while he was in custody elsewhere, and that he experiences "abscess" and "drainage" from the opening that "causes [him] to get sick." He adds that he has "never asked for a root canal," but that all he "asked is that [his] tooth be filled but first irrigated."

The relevant facts are contained in plaintiff's submissions demonstrating his attempts to exhaust all available avenues of relief within ROSP's administrative remedies system. On January 3, 2006, plaintiff filed an informal complaint form, stating that he had "a dental emergency" because he had "an absess [sic] on [his] gums and an unfinished root canal." He received a response dated January 6, 2007, stating that he had been seen in dental on that date and that he had been "placed on

---

[13](...continued)
postage for legal mail. It is also possible that the mail for which he wishes to obtain free postage is not, in fact, legal mail. As White makes clear, **indigent** inmates may be entitled to a reasonable amount of postage to send **legal mail**. 886 F.2d at 723. However, because plaintiff has failed to demonstrate an actual injury, the court need not determine the presence or absence of these factors.

[14] The court repeats that plaintiff's complaint and attachments thereto total 143 pages.

16

a waiting list and will be seen. . . ." The response further stated: "No emergency noted!" On January 10, 2006, plaintiff filed a regular grievance form, stating that he had "an unfinished root canal," which was an emergency, and that the root canal was documented in his dental files from the Mecklenburg Correctional Center ("Mecklenburg").[15] He added: "This is an emergency. (I could get real sick and my teeth rott [sic]) so medical is now liable." On February 2, 2006, the Warden issued his Level I response to plaintiff's grievance, stating, in pertinent part:

> **Grievance Summary:** You stated in your informal on January 3, 2006, you have an abscess on your gum and an unfinished root canal. You have pain in your tooth and your tooth is at risk of infection because it's open on back. You need to get the root canal finished and the abscess taken out. This is an emergency.
>
> **Informal Summary:** Your informal complaint, responded to by J. Saylers, RDH, stated "seen in dental on January 6, 2006. Discussed: We did not have a dentist at present time. He will be placed on a waiting list and will be seen when we get a dentist. No emergency noted."
>
> **Investigation:** J. Saylers, RDH, explained to you that you are on the list to be seen, however at this time we have a dentist coming from Wallens Ridge to do emergencies only. A root canal is not considered an emergency. You will be seen as soon as we get all of the emergencies taken care of. In the mean time if you need something for pain put in a request to the dental staff or to one of the nurses for assistance. Also, patients are not sent off of the compound for root canals.
>
> * * *
>
> In accordance with the above information, this grievance is considered to be **UNFOUNDED** . . . .

Plaintiff filed a Level II appeal of the denial of his grievance. On February 24, 2006, the VDOC's Health Services Director upheld the Warden's denial, stating, in relevant part:

> Your grievance appeal has been reviewed along with the response from Level I, and your original complaint that you have an unfinished open root canal and that it is an

---

[15] Plaintiff indicates that this particular dental issue began when he was an inmate at Mecklenburg. At that time, plaintiff states that he was treated by "a street surgeon in South Boston," Virginia.

17

emergency. You want your root canal finished.

> Based on the information provided and upon further investigation, I concur with the
> Level I respondent and determine that your grievance is unfounded. A review of your
> record revealed that you were examined on 1/6/06 in the dental clinic and it was
> determined that you did not have an emergency condition. The dentist will determine
> if your root canal can be completed. Open canals of any length of time may render
> the tooth non-restorable with a root canal. If you have pain, you should sign up for
> sick call to see the dentist and have the tooth evaluated and a course of treatment
> recommended. When you were seen in the dental clinic on 1/3/06, no emergency
> was noted and you did not utilize the procedures for emergency treatment. There has
> been no denial of emergency treatment. There has been no violation of policy.

Plaintiff was informed that the Level II response concluded "the last level of appeal for this
complaint."

On October 24, 2006, plaintiff filed a regular grievance form. Additionally, plaintiff filed
an informal complaint on November 2, 2006, following an appointment with the dentist on
November 1, 2006. On November 17, 2006, the Warden issued his Level I response to plaintiff's
grievance, stating, in pertinent part:

> **Grievance Summary:** You stated you are not requesting a root canal. You want
> your tooth irrigated and filled. You want this done even though the dentist does not
> recommend this procedure.

> **Informal Summary:** Your informal complaint, responded to by D. Messer, DA,
> stated "Mr. Talbert, your name is on the dentist list. The filling that you are talking
> about, the dentist does not recommend putting a filling in, but if your [sic] still
> wanting the filling in you will need to sign a form that you give him permission to
> put the filling in."

> **Investigation:** Your name is on the dentist list. The filling that you are talking
> about, the dentist does not recommend. If you still want the filling to be put in your
> tooth after he has told you it could abscess you will need to sign a form that you're
> give [sic] him permission to put the filling in place.

> Further follow-up on this grievance found you were seen on November 1, 2006. You
> were advised that you would have to sign a form given [sic] the dentist permission
> to fill your tooth and you refused treatment. Sgt. G. Adams and Officer T. Mullins

18

were present when you refused treatment.

*  *  *

In accordance with the above information, this grievance is considered to be **UNFOUNDED** . . . .

Plaintiff filed a Level II appeal of the denial of his grievance. On December 13, 2006, the VDOC's Health Services Director upheld the Warden's denial, stating, in relevant part:

Your grievance appeal has been reviewed along with the response from Level I, and your original complaint that the dentist refused to fill your abscessing tooth.

Based on the information provided and upon further investigation, I concur with the Level I respondent and determine that your grievance is unfounded. A review of your case revealed that you requested that your abscessing tooth be irrigated and filed [sic]. The dentist recommended that the tooth be extracted, [but] you refused the extraction[,] and instructed the dentist to irrigate and put a filling in the tooth. The dentist properly applied standards of dentistry by not irrigating and filling an abscessing tooth. Such an action would have worsened the situation and caused the infection to spread into the soft tissue. There has been no denial of proper treatment and no violation of the standards of dentistry. The Level I response is correct.

Plaintiff was informed that the Level II response concluded "the last level of appeal for this complaint."

In the instant complaint, plaintiff maintains that he has been "refused" appropriate dental care. According to plaintiff, the dentist in South Boston, Virginia, who originally began treatment on the tooth at issue here while plaintiff was an inmate at Mecklenburg, "did not irrigate [plaintiff's] mouth," "put a temporary pink filling in [plaintiff's] mouth," and "that's why [plaintiff] got a [sic] absess [sic]." He states that he "explained this to the [ROSP] dentist," but that "[t]hey then began makeing [sic] up excuses, on [sic] why they could not send me to a surgeon if the absess [sic] did return after they fill [sic] it." He states that he was "told that [he] could not have a filling if [he did not] sign a paper," but that he refused because "its [sic] not a part of any policy or procedure." He

19

adds: "I also told them from what they just explained to me that I will not sign a paper to let you deliberately destroy my mouth." In plaintiff's view, being required to sign a consent before he could receive treatment that was contrary to the dentist's advice "would throw away all [his] rights and [defendants] could deliberately violate [him]." Plaintiff insists that the dentist's prognosis was not "based on medical facts" but was "only guessing, hypothesis and so-called psychic abilities because they don't know what would happen if my tooth is irrigated and filled and by law a dentist is supposed to cut a [sic] abcess [sic] out if any prisoner had one."[16]

In order to state a cognizable claim for denial of medical care under the Eighth Amendment, a plaintiff must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish deliberate indifference, a plaintiff must present facts to evince that the defendants had actual knowledge of and disregard for an objectively serious medical need. Farmer v. Brennan, 511 U.S. 825, 847 (1994); see also Rish v. Johnson, 131 F.2d 1092, 1096 (4th Cir. 1997). "'A serious medical need' is 'one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Shelton v. Angelone, 183 F. Supp. 2d 830, 840 (W.D. Va. 2002) (quoting Cox v. District of Columbia, 834 F. Supp. 439, 441 (D. D.C. 1992)). Disagreements between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment are not cognizable constitutional claims under the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Estelle, 429 U.S. at 105-06. To bring such a claim against non-medical prison personnel, an inmate must

---

[16] Plaintiff further states that the tooth causes him pain and has a draining abscess that makes him ill and causes "nerve problems, fatigue, diarreah [sic], weakness, vomiting, stomach pains[,] etc[.]" Yet, he maintains that the "tooth is strong" and "healthy."

20

show that such officials were personally involved with a denial of treatment, deliberately interfered with a prison physician's treatment, or tacitly authorized or were indifferent to the prison physician's misconduct. Miltier v. Beorn, 896 F.2d 848, 854-55 (4th Cir. 1990). Claims of medical judgment are not subject to judicial review. Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975). Additionally, an inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).

Plaintiff's own submissions clearly indicate that plaintiff has received adequate dental treatment, and that he refuses to submit to appropriate care as prescribed by the dentist. Instead of having the tooth pulled, as the dentist has prescribed, plaintiff's submissions indicate that he would prefer instead to have it irrigated, filled, and eventually crowned. However, plaintiff's preferred course of treatment is in contravention of the advice of the prison dentist.[17] Significantly, against the advice of the dentist, plaintiff could have the tooth irrigated and filled, as he prefers, but the dentist will provide such care only after plaintiff signs appropriate forms acknowledging the risk of following a course of treatment that is explicitly against the dentist's professional advice. Plaintiff, however, refuses to submit to such a formality, insisting that the prison dentist should bear the risk

---

[17] Moreover, inasmuch as plaintiff's preferred course of treatment ultimately seeks the placement of a crown, rather than the extraction of the tooth, it is cosmetic and therefore is not medically necessary. Plaintiff also seeks to have four gold crowns "cemented in again properly."

21

of plaintiff's folly. Although plaintiff may believe that defendants have been deliberately indifferent to his dental needs by not providing the type of care he would prefer to receive, and by not proceeding with a course of treatment that the prison dentist has deemed medically inappropriate, plaintiff has not alleged any conduct that rises to the level of a federal constitutional violation. Plaintiff does not present facts to evince that the prison dentist had actual knowledge of and disregard for an objectively serious medical need. In fact, the dentist has offered a course of treatment, which plaintiff has declined.

In sum, plaintiff was provided treatment for his tooth, and simply disagrees with the diagnosis and proffered course of treatment, which does not establish a cognizable constitutional claim. Wright, 766 F.2d at 849; Estelle, 429 U.S. at 105-06. Accordingly, the court finds that plaintiff's claim under the Eighth Amendment fails because he has not shown that defendants were deliberately indifferent to any serious medical need or any other substantial risk of serious harm. Farmer, 511 U.S at 833. Nor has he alleged facts sufficient to show a serious or significant mental or physical injury or an unreasonable risk of serious damage to his future health as a result of the dentist's treatment. Strickler, 989 F.2d at 1380-1381. It is clear from plaintiff's own submissions that any risk to plaintiff's health is because of his own insistence that he, not the dentist, should dictate and prescribe the appropriate course of dental treatment.[18, 19]

_____

[18] To the extent that plaintiff's complaint could be construed to state a claim for dental malpractice or negligence, such claim would arise, if at all, under state medical malpractice laws, and does not present a colorable claim under § 1983. See Estelle, 429 U.S. at 105-106. To the extent plaintiff believes he has an actionable claim under state negligence law, the court declines to exercise supplemental jurisdiction over such claim, pursuant to 28 U.S.C. § 1367(c)(3).

[19] Moreover, to the extent plaintiff's complaint could be construed to assert that it is unconstitutional for the VDOC or ROSP not to have a sufficient number of dentists employed at all times to provide complete dental care the very instant any dental issue arises, plaintiff's claim fails. Although plaintiff may believe that ROSP failed
(continued...)

22

For these reasons, plaintiff has failed to state an Eighth Amendment claim of deliberate indifference to a serious medical need. Accordingly, this claim will be dismissed, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief can be granted.

## VII. Kitchen Claims

Plaintiff raises an assortment of claims alleging that the preparation and service of food at ROSP does not accord with the dictates of the Common Fare religious diet, which plaintiff receives as a member of the Nation of Islam ("NOI").[20] Plaintiff presents an abundance of materials indicating his attempts to exhaust the administrative remedies procedures at ROSP, and his properly exhausted grievances and appeals disclose many relevant facts.[21]

---

[19](...continued)
to treat his dental needs by not providing treatment to him on a schedule that gratified his demands, such actions do not rise to the level of a federal constitutional violation. Moreover, it is clear that plaintiff suffered no Eighth Amendment violation as to his dental treatment because, in fact, the evidence indicates that the dental department at ROSP did indeed offer to provide extensive dental treatment to plaintiff, including an offer, which plaintiff declined and apparently still declines, to extract the affected tooth. Plaintiff's claim that the dental department at ROSP is insufficiently manned would arise, if at all, under state medical malpractice laws, and does not present any colorable 42 U.S.C. § 1983 claim. Estelle, 429 U.S. at105-106. To the extent plaintiff believes he has an actionable claim under state medical malpractice laws, the court declines to exercise supplemental jurisdiction over such claim, pursuant to 28 U.S.C. § 1367(c)(3).

[20] The Common Fare diet is designed to meet the needs of a wide variety of religious groups, including Jews and Muslims. See Madison v. Virginia, 474 F.3d 118, 123 (2006); Acoolla v. Angelone, et al., Civil Action No. 7:01-cv-01008, slip op. at 6 (W.D. Va. September 1, 2006).

[21] Plaintiff can bring to this court only such claims as have been preserved by his proper exhaustion of all administrative remedies. Plaintiff presents a number of informal complaint forms that do not bear sufficient information identifying to which grievance they correspond. Because of the close proximity of the dates on the submissions, the court is unable to use the dates to determine which documents support which grievances. For the same reason, the court is unable to determine which of plaintiff's grievances correspond to the photocopies plaintiff has submitted of the reverse sides of his grievance forms, where the Grievance Coordinator and Regional Ombudsman cite their reasons for making adverse intake determinations. However, the Level I and Level II appeals recite the background information for plaintiff's properly exhausted grievances.
In 1996, Congress enacted the Prison Litigation Reform Act ("PLRA") which provides, in part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). A district court may sua sponte dismiss a complaint where a
(continued...)

23

On May 21, 2007, plaintiff filed a grievance concerning the substitution, on one date, of cottage cheese on the Common Fare tray with "yellow cheese."[22] On June 15, 2007, the Warden issued the his Level I response to plaintiff's grievance, stating, in relevant part:

> **Grievance Summary:** You stated yellow cheese was sent on your Common Fare tray to replace cottage cheese on May 10, 2007. Officer Branham and Officer Creech called the kitchen to check on this, and Ms. McKnight informed them that they were out of cottage cheese in Food Service and that yellow cheese is kosher. Yellow cheese is not kosher and this is a violation of DOP 611.
>
> **Informal Summary:** Your informal complaint, responded to by D. Stallard, Food Service Assistant, on May 18, 2007[,] stated . . . [sic] Your complaint has been noted and given to Ms. McKnight.

---

[21](...continued)
prisoner's failure to exhaust is apparent from the face of the complaint. Anderson v. XYZ Correctional Health Services, 407 F.3d 674, 683 (4th Cir. 2005). Proper exhaustion of administrative remedy procedures for purposes of § 1997e(a) means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. See, e.g., Woodford v. Ngo, 548 U.S. ___, slip op. at 6-8 (2006). Section 1997e(a) applies whether or not the form of relief the inmate seeks is available through exhaustion of administrative remedies. Booth v. Churner, 532 U.S. 731, 741 (2001). The exhaustion provision is mandatory, even in those instances where an inmate claims that exhaustion would be futile or the remedy inadequate. Id. at 741, n.6.

Plaintiff, in some of his informal complaint forms, miscellaneous letters to prison officials, and grievances, threatens prison officials with litigation for having denied some of his grievances as untimely or otherwise improperly presented, e.g., for not having the required supporting documentation. Plaintiff's own documentation indicates that these grievances were returned to him as deficient, and that he did not appeal the denial of any of those initial grievances or correct the deficiencies and resubmit the grievances within the allotted time. Because plaintiff did not utilize all steps of the grievance procedures when they were available to him, the court concludes that he failed to exhaust his administrative remedies as to these claims. The court notes that defendants' conduct, i.e., insisting that plaintiff abide by established rules and procedures governing the filing of administrative remedies, does not rise to the level of a constitutional violation. Woodford, slip op. at 6-8. Moreover, inmates do not have a constitutionally protected right to participate in a grievance procedure. Brown v. Dodson, 863 F.Supp. 284 (W.D. Va.1994). See also Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991) (federal regulations providing for administrative remedy procedure do not in and of themselves create liberty interest in access to that procedure). The court will not consider those claims where it is clear that plaintiff failed to exhaust all available administrative remedies. Regarding plaintiff's threats of litigation against ROSP officials for their adverse intake determinations concerning his deficient grievances, plaintiff is advised that, pursuant to 28 U.S.C. § 1915A, a court "shall . . . dismiss the complaint, or any portion of the complaint, if the complaint . . . is . . . malicious. . . ." Plaintiff is further advised that, pursuant to 28 U.S.C. § 1915(e)(2), "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . is . . . malicious."

[22] This grievance, the Level I response, and the Level II response all bear the log number 620-25433.

24

A face-to-face meeting was conducted for this grievance. Ms. McKnight, Food Service Supervisor spoke with you on May 24, 2007.

**Investigation:** The yellow cheese you were served is a kosher item. Ms. Shear, the Food Service Dietician in Richmond approved this item. There has been no violation of policy or procedure.

\* \* \*

In accordance with the above information, this grievance is considered to be **UNFOUNDED**, as procedures have been correctly applied. No further action appears to be necessary at this time.

Dissatisfied with this response, plaintiff appealed. On July 1, 2007, the VDOC's Regional Director issued his Level II response, stating, in pertinent part:

Your grievance appeal has been reviewed along with the Level I response and your original complaint. Your complaint that yellow cheese served on your Common Fare meal on 5/10/07 was not kosher has been investigated. Investigation revealed that this was a kosher item and is an approved substitution on the Common Fare Menu. . . .

Based on the information provided, I am upholding the decision of the Level I respondent, which has determined that your grievance is unfounded.

On July 9, 2007, plaintiff filed a grievance, complaining that the lids for Common Fare trays had been used on regular trays, that Common Fare trays were being washed with regular trays, and that, on July 1, 2007, his Common Fare tray had dried food on it.[23] On August 9, 2007, the Warden issued his Level I response to plaintiff's grievance, stating, in relevant part:

**Grievance Summary:** You stated Common Fare trays were not handled as per policy on July 1, 2007. Dried food was on them from the regular menu trays. Spaghetti sauce and dried up greens were on your Common Fare tray and lid. The Common Fare trays are not even supposed to be washed with the regular trays. Policy is not being followed or this could not happen.

**Informal Summary:** Your informal complaint responded to by D. Stallard, Food

_____

[23] This grievance, the Level I response, and the Level II response all bear the log number 620-25694.

25

Service Assistant[,] on July 6, 2007[,] stated . . . [sic] Common Fare Trays and utensils are washed, rinsed, dried, and kept separate from all others in the kitchen. I can see the Common Fare Trays made everyday and from what I observe DOP 611 is being followed.

A face-to-face meeting was conducted for this grievance. You were interviewed regarding this issue by by [sic] C. Salyer, Food Services Supervisor[,] and D. Stallard, Food Service Assistant[,] on July 16, 2007.

**Investigation:** Common Fare Trays and lids are washed by themselves and placed on a rack by themselves in the kitchen. Common Fare trays and lids are not washed or stored with regular food trays. Policy is being followed by Food Service staff. No merit was found to your complaint.

* * *

In accordance with the above information, this grievance is considered to be **UNFOUNDED**, as procedures have been correctly applied. No further action appears necessary at this time.

Plaintiff appealed. On August 22, 2007, the Regional Director issued his Level II response,

stating, in pertinent part:

Your grievance appeal has been reviewed along with the Level I response and your original complaint. Your grievance wherein you state that on July 1, 2007, Common Fare lids were not handled in accordance with departmental policy as evident by the fact that the Common Fare tray lid contained dried food items from the regular menu trays has been investigated. You state that Common Fare tray lids are not supposed to be washed with the regular tray lids. Investigation reveals that there is no evidence to support your claim that on July 1, 2007, that your Common Fare tray lid contained dried food items from the regular trays on them. Common Fare tray[s], tray lids, and utensils are washed, rinsed, dried, and kept separate from all others in the kitchen. Your issues were investigated and it was determined there was no merit to your claim.

Plaintiff was informed that the decision of the Level I respondent was upheld, and that Level II

represented the last level of appeal for the grievance.

On July 9, 2007, plaintiff filed a grievance, complaining that the trays used to serve his

Common Fare meals on July 1, 5, and 27, 2007, were not big enough to carry all of the food on the

26

menu.[24] On August 9, 2007, the Warden issued his Level I response to plaintiff's grievance, stating, in relevant part:

> **Grievance Summary:** You stated the real Common Fare trays are the tan ones with a clear top, however they are not being used now. Food items are missing when you receive the blue Common Fare trays as all the food will not fit on that tray. Food items were missing several times when you received a blue tray because there was not room for it on the tray. You want your meals served in the tan Common Fare trays.
>
> **Informal Summary:** Your informal complaint, responded to by D. Stallard, Food Service Assistant[,] on July 6, 2007[,] stated . . . [sic] So noted.
>
> **Investigation:** Ms. Salyer, Food Service Supervisor[,] has advised that all foods that are listed on the menu are sent to you regardless of whether you receive a tan tray or a blue tray. Nothing is left off any tray. Foods are sent on the tray or with the tray. No merit was found to your complaint.
>
> * * *
>
> In accordance with the above information, this grievance is considered to be **UNFOUNDED**, as procedures have been correctly applied. No further action appears to be necessary at this time.

Plaintiff appealed. On August 22, 2007, the Regional Director issued his Level II response, stating, in pertinent part:

> Your grievance appeal has been reviewed along with the Level I response and your original complaint. Your grievance wherein you state that you are not receiving all of the items on your Common Fare tray when the blue trays are used has been investigated. You state that the tan trays are the real Common Fare trays and that when the blue trays are used all of the food will not fit on the tray. You state that you want your meals served in the tan Common Fare trays. Investigation reveals there is no evidence to support your claim that you are not receiving the correct and appropriate portions of food on your Common Fare tray. Common Fare meals are prepared and served in accordance with the Common Fare menu. Ms. Salyers, Food Service Supervisor[,] states that all foods that are listed on the Common Fare menu are served regardless of whether they are served on a blue Common Fare tray or a tan Common Fare tray. Your issues were investigated and it was determined there was

---

[24] This grievance, the Level I response, and the Level II response all bear the log number 620-25727.

no merit to your claim.

Accordingly, the Warden's denial was upheld, and plaintiff was informed that the Regional Director's response constituted "the last level of appeal for this grievance."

On July 9, 2007, plaintiff filed a grievance complaining about the occasional substitution on the Common Fare menu of one vegetable for another, in particular the substitution, at dinner on July 5, 2007, of an onion for the scheduled tomato.[25] On August 14, 2007, the Warden issued his Level I response to plaintiff's grievance, stating, in relevant part:

> **Grievance Summary:** You stated the kitchen is not following the Common Fare menu. They say a substitute is sent for an item, and then it is not on the tray. Food Service told the officers that an onion was to replace the tomatoes on July 5, 2007, however that was a lie since you were to have an onion with that meal as per the menu. Sgt. Hale took your tray to the kitchen and had it corrected. You were given cucumbers as a substitute for the tomatoes. The Common Fare menu is not being followed on Thursday (Week 2) or this would not keep occurring.

> **Informal Summary:** Your informal complaint, responded to by D. Stallard, Food Service Assistant[,] on July 11, 2007[,] stated . . . [sic] If you look at the Common Fare menu in the bottom left corner there is a notation that says, "Food Service Directors may make substitution when necessary in accordance with the Food Service Manual." Ask the pod officer to call the kitchen for replacement items on your tray.

> **Investigation:** Onion is not on the Common Fare menu (Week 2) for lunch or dinner. It was an appropriate substitute for the tomatoes on July 5, 2007. Please check your menu to ensure that it is current. The current Common Fare menu states:

> Week 2 – Lunch Menu:        Fruit, sardines, vegetarian beans, broccoli, lettuce, bread, mustard, margarine, beverage

> Week 2 – Dinner Menu:        Fruit, vegetarian beans, tomato, cauliflower, celery sticks, carrot sticks, bread, cottage cheese, margarine, beverage

> The Common Fare Menu is followed by Food Service, and substitutions are made only when necessary. There has been no violation of policy.

---

[25] This grievance, the Level I response, and the Level II response all bear the log number 620-25728.

\* \* \*

> In accordance with the above information, this grievance is considered to be **UNFOUNDED**, as procedures have been correctly applied. No further action appears to be necessary at this time.

Plaintiff appealed the denial. On August 24, 2007, the Regional Director issued his Level II response, stating, in pertinent part:

> Your grievance appeal has been reviewed along with the Level I response and your original complaint. Your complaint that staff is not following the Common Fare Menu has been investigated. You claim policy was violated when an onion was substituted in place of a tomato on 7/5/07. Investigation revealed that an onion was a suitable replacement. No evidence has been found to substantiate your claim that the Common Fare Menu is not being followed.

Thus, the Regional Director upheld the denial of plaintiff's grievance, and plaintiff was informed that the Regional Director's Level II response constituted "the last level of appeal for this grievance."

Plaintiff filed the instant complaint. Construing the complaint liberally, plaintiff brings the following properly exhausted claims alleging violations of his rights under the Free Exercise clause of the First Amendment and RLUIPA: he was served "yellow" cheese instead of cottage cheese on May 21, 2007, and the serving of the yellow cheese on that date proves that the VDOC and ROSP does not properly serve the Common Fare diet to those inmates who qualify for it; dried food on the lid of his tray on July 1, 2007, proves that Common Fare trays are not being properly maintained separately from regular trays; he received inadequate portions on July 1, 5, and 27, 2007, when he was served meals on the blue Common Fare trays instead of the tan Common Fare trays; on July 5, 2007, he was served an onion instead of a tomato, and this substitution proves that the VDOC and

29

ROSP do not properly serve the Common Fare diet to those inmates who qualify for it.[26]

## A. First Amendment

Although inmates clearly retain their First Amendment right to free exercise of religion in prison, O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987), including the right "to receive diets consistent with their religious scruples," Kahane v. Carlson, 527 F.2d 492, 495 (2nd Cir. 1975), "only intentional conduct is actionable under the Free Exercise Clause," Lovelace, 472 F.3d at 201 (citing Daniels, 474 U.S. at 329-31). In Lovelace, the Court of Appeals approved the district court's extension of the analysis in Daniels to the inmate plaintiff's First Amendment free exercise claim, where the district court (Kiser, J.) reasoned that the operative word "prohibit" in the First Amendment connotes a "conscious act" rather than a merely negligent one, and held that negligent interference with free exercise rights is not actionable under § 1983. Lovelace, 472 F.3d at 201; see also Lewis v. Mitchell, 416 F. Supp.2d 935, 942-44 (S.D. Cal. 2005); Shaheed v. Winston, 885 F.Supp. 861, 868 (E.D. Va. 1995).

Only intentional conduct is actionable under the Free Exercise Clause, and plaintiff has not identified any particular defendant whose intentional conduct deprived him of his free exercise rights. Taken in the light most favorable to plaintiff, the facts he alleges and the documentary

---

[26] Plaintiff also alleges that Common Fare diet recipients are served pork, corn, and other foods that are not approved for the Common Fare menu because, in his words, "they are unkosher," and this violates his rights. Yet, he also alleges that prison officials' response that certain foods are "kosher" violates his rights because "kosher" "means those foods that meet certain criteria of Jewish Law," and that he is a "Muslim[,] not [a] Jew. . . ." Plaintiff's extensive documentation of his resort to ROSP's administrative remedies system regarding the claims in the instant complaint indicates that he has not filed or exhausted any grievances regarding these issues. Significantly, plaintiff's thorough grievance documentation indicates that he has not filed any grievances regarding the general portion size and caloric impact of the food he receives on the Common Fare diet. As the preceding factual summary indicates, the most plaintiff complained of in his grievances was having received inadequate portions on July 1, 5, and 27, 2007, when he was served meals on the blue Common Fare trays instead of the tan Common Fare trays. Accordingly, the court will not consider his claim that having received inadequate portions has caused him to "loose [sic] major weight."

evidence he submits support, at most, a finding that defendants' actions resulted from negligence and not from intentional action.[27] Indeed, the isolated incidents plaintiff complains of indicate a lack of intent on the part of defendants. Moreover, the court has already observed that "the inquiry under RLUIPA is more rigorous than under the First Amendment," Lovelace, 472 F.3d at 188 n. 3, and, as the court will explain in the next section, the facts indicate that the isolated incidents plaintiff complains of do not constitute a burden on the exercise of plaintiff's RLUIPA rights, and therefore do not constitute a violation of his Free Exercise rights.

For these reasons, the court will dismiss plaintiff's First Amendment claims regarding the preparation and service of food at ROSP, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief may be granted.

### B. RLUIPA

The court has already discussed, in Section IV.A., the "substantial burden" standard for RLUIPA claims. The court finds, based on plaintiff's allegations and the documents he submits in support of those allegations, that plaintiff cannot show that the isolated incidents of which he complains have placed "substantial pressure" on him "to modify his behavior and to violate his beliefs" so as to constitute a substantial burden on his religious exercise.[28] Lovelace, 472 F.3d at

---

[27] The court notes that plaintiff's own allegations state that he has continued to participate in the Common Fare diet, and it is clear that he was not forced to eat any food that he felt did not comport with the dictates of his religious diet.

[28] Regardless of the frequency of these occurrences, plaintiff's allegations fail to state a claim; he fails to show that he has been pressured to violate his religious beliefs because of a serving of yellow cheese on his otherwise acceptable tray, dried remnants of food on a washed tray, variation in the sizes of trays, and the occasional substitution of one acceptable vegetable for another. See Acoolla v. Angelone, et al., Civil Action No. 7:01-cv-01008, slip op. at 18 n. 13 (W.D. Va. September 1, 2006) (rejecting bald allegation that VDOC's process of sanitizing food trays fails to remove all significant traces of food); Tuller v. Braxton, et al., Civil Action No. 7:02-cv-01297 (W.D. Va. September 17, 2004) (finding "unsupportable" plaintiff's claims that trays were
(continued...)

31

187. Because plaintiff has not demonstrated that the isolated incidents above placed a substantial burden on his exercise of religion, the RLUIPA claims will be dismissed, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief may be granted.

## X. Conclusion

Based on the foregoing, the court will dismiss the instant complaint, pursuant to 28 U.S.C. § 1915A, for failure to state a claim upon which relief may be granted.[29]

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

**ENTER:** This ⟨8th⟩ day of November, 2007.

_____

United States District Judge

---

[28](...continued)
"intermixed" and banging "Common Fare Diet . . . against the same garbage pail as trays for other meals [rendered] them unsuitable for holding kosher meals" when defendants maintained "that the trays are color-coded," "are not mixed," and "are stored, washed, and handled separately"; further, plaintiff's admission that he continued to eat meals from such trays indicated that he did "not really believe" that the trays rendered the Common Fare Diet meals "un-kosher"); Frazier v. Ferguson, Civil Action No. 04-5140, slip op., 2006 WL 2052421, at *4 (W.D. Ark. 2006) (finding no substantial burden under RLUIPA where Seventh-day Adventist inmate received vegetarian diet and had to discard some items that did not comport with his religious preference for vegan diet); Kretchmar v. Beard, Civil Action No. 05-6108, slip op., 2006 WL 20386887, at * 5 (E.D. Pa. 2006) (finding no RLUIPA or First Amendment violation where inmate received nutritionally adequate kosher diet, although it was repetitious and cold), aff'd, Third Cir. Case No. 06-4039, slip op., 2007 WL 2050878 (July 18, 2007) (also observing that appellant's objections to being served non-Kosher food during Passover of 2005 had not been exhausted before the suit was filed and had been properly dismissed by the district court). Regarding plaintiff's allegation that he was served "yellow" cheese, which was "unkosher," the court's research indicates that there are "yellow" cheeses that are kosher, that some processes convert unacceptable foods into acceptable ones, and that it is sometimes acceptable to eat prohibited foods if one waits a prescribed period of time before consuming permitted foods. See http://en.wikipedia.org/wiki/Kosher; http://en.wikipedia.org/wiki/Halal; http://en.wikipedia.org/wiki/Muslim_dietary_laws.

[29] Plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

32